IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

**ESTATE OF GRACE KALAMA**, by and
through her personal representative, Debbie
Scott; **ESTATE OF SEAN STARR**, by and
through his personal representative, Ramon
Starr; **ESTATE OF VALERIE SUPPAH**,
by and through her personal representative,
Lucille Suppah; and **LADAMERE
KALAMA**, by and through his conservator,
Roland Kalama, III,

       Plaintiffs,

v.

**JEFFERSON COUNTY**, a political
subdivision of the state of Oregon; and
**JASON MICHAEL EVAN**,

       Defendants.

Case No.  3:12-CV-01766-SU

**FINDINGS AND
RECOMMENDATION**

Page 1 - FINDINGS AND RECOMMENDATION

SULLIVAN, United States Magistrate Judge:

Debbie Scott, as personal representative of the estate of Grace Kalama; Ramona Starr, as personal representative of the estate of Sean Starr; Lucille Suppah, as personal representative of the estate of Valerie Suppah; and Roland Kalama III, as conservator for Ladamere Kalama (collectively "representatives"), filed a complaint under 42 U.S.C. § 1983 against defendants Jefferson County, county deputy Jason Michael Evan ("Evan"), and Does 1 through 5. Representatives allege violations of decedents' and protected person's Fifth and Fourteenth Amendment rights. Representatives also claim negligence and seek almost $20 million in damages under Oregon law for wrongful death and personal injuries to decedents and protected person ("plaintiffs"). Defendants move for summary judgment on all of the claims. For the reasons set forth below, the motion for summary judgment should be granted as to the federal claims. The remaining state-law negligence claims should be dismissed without prejudice.

## BACKGROUND

This case concerns a chain of events that ended in a tragic car accident, claiming the lives of three adults and one toddler and leaving another young child permanently disabled. The events began with a burglary at Soundz Unlimited, a stereo store in Madras, Oregon. At about 9:52 p.m. on Sept. 29, 2010, the Jefferson County Sheriff's Office received and transmitted to its deputies a report that multiple suspects had burglarized the store and shots were fired. 2d Am. Compl., at 5. No one was reported hurt. *Id.* Dispatch alerted deputies to seek multiple suspects and provided descriptions of the car. *Id.*; Pls.' Resp. to Mot. for Summ. J. Ex. A, at 19-20.

Jefferson County Sheriff's deputy Evan was on duty, received the report from dispatch, and,

at some point thereafter, drove his patrol car to the corner of Pelton Dam Road and Highway 26. Pls.' Resp. to Mot. for Summ. J., at 3-4; 2d Am. Compl., at 5-6.  Evan spoke by phone with a Warm Springs police officer who told him police believed the car was bound for the Warm Springs reservation.  Pls.' Resp. to Mot. for Summ. J., at 4;  Mem. in Supp. of Mot. for Summ. J., at 7.  The Warm Springs officer also informed Scott that police had set up a spike strip along Highway 26 near the entrance to the reservation so they could stop the suspect car.  Pls.' Resp. to Mot. for Summ. J., at 4; Mem. in Supp. of Mot. for Summ. J., at 7.

At 10:07 p.m., Evan saw a grey 2005 Toyota Corolla "that matched the description of the suspect vehicle" with a "driver and number of occupants [that] matched the description of suspects involved in the incident." 2d. Am Compl., at 6.  The car traveled along Pelton Dam Road and turned onto Highway 26 heading west toward Warm Springs.  Pls.' Resp. to Mot. for Summ. J., at 4; Mem. in Supp. of Mot. for Summ. J., at 7-8.  Evan followed.  *Id.*  At 10:08 p.m., Evan pulled the car over on suspicion that the car's occupants had committed the stereo store burglary.  *Id.;* 2d Am. Compl., at 6-7.

At the time of the stop, April Scott was driving the car.  2d Am. Compl., at 5-6.  The car contained two other adults, Valerie Suppah in the front seat, and Sean Starr sitting in the back.  *Id.* at 5.  Also in back seat were April Scott's two young children, 4-year-old Grace Kalama, and 23-month-old Ladamere Kalama.  *Id.*  Evan would later state he did not know the children were there until after the accident.  *Id.* at 7; Pls.' Resp. to Mot. for Summ. J. Ex. B, at 13.

Before Evan exited his vehicle  and approached Scott's car, he notified dispatch of the stop. Pls.' Resp. to Mot. for Summ. J., at 4.  Evan then ordered the car's occupants to put their hands on the ceiling and they complied, according to Evan's account.  *Id.* at 6.  Evan then began approaching

the car from the passenger side, and in doing so, noticed a man in the backseat with a stereo speaker

in his lap, Evan reported.  Pls.' Resp. to Mot. for Summ. J. Ex. B, at 12.  At that point, at 10:13 p.m.,

Evan said he called for backup, telling dispatch he had the suspects.  *Id.*  At the same time, Scott

drove away from the traffic stop, leaving Evan standing by the side of Highway 26.  2d Am. Compl.,

at 7.  A witness, Clem Picard, reported seeing a car career past him in the wrong lane at about 90

mph at around that time.  Decl. of Clem Picard in Supp. of Mot. for Summ. J., at 2.[1]

When Scott fled, Evan immediately got in his car, turned on his siren and police lights, and

began pursuing Scott down westbound Highway 26, reaching speeds of more than 80 mph.[2]  2d Am.

Compl., at 7.  At 10:14 p.m., one minute after Scott fled the police stop, her car crossed over the

center line on Highway 26 into the oncoming eastbound lane.  Pls.' Resp. to Mot. for Summ. J. Ex.

B, at 1, 12, 19.  She struck the eastbound guardrail.  *Id.*; Pls.' Resp. to Mot. for Summ. J. Ex. C, at

9-10.  Then Scott's car collided with an oncoming Warm Springs Tribal Police car, driven by tribal

officer Tod Henry Kerr.  2d Am. Compl., at 7; Pls.' Resp. to Mot. for Summ. J. Ex. B, at 12.  Kerr

was traveling from Warm Springs to assist deputy Evan.  Pls.' Resp. to Mot. for Summ. J., at 7.

April Scott, Valerie Suppah, Sean Starr, and Grace Kalama died as a result of the accident.

Ladamere Kalama survived but suffered permanent mental and physical injury.  2d Am. Compl., at

7, 14.

---

[1] Representatives contend there is a dispute of fact regarding the Picard declaration.  Pls.' Resp. to Mot. for Summ. J., at 7.  However, after review of representatives' Exhibit C and the Picard declaration, the Court finds no inconsistencies.  Decl. of Clem Picard in Supp. of Mot. for Summ. J.; Pls.' Resp. to Mot. for Summ. J. Ex. C, at 7-8.

[2] There is some dispute as to how quickly Evan returned to his car and initiated pursuit of the fleeing suspect.  As this is summary judgment, the Court relies on representatives' version of the events.

In their initial complaint, representatives named as defendants the county, Evan, and five Does, as well as The Confederated Tribes of the Warm Springs Reservation of Oregon and Warm Springs tribal officer Tod Henry Kerr.  However, the Court dismissed the claims against the Tribes on the grounds of tribal immunity and later dismissed all claims against Kerr.  The Court also dismissed with prejudice representatives' initial Section 1983 claims for "punishment without trial by jury" under the Fifth, Sixth, Eighth, and Fourteenth Amendments and for "restraint of liberty without a warrant" under the Fifth and Fourteenth Amendments.  Representatives filed an amended complaint and later a second amended complaint.  The second amended complaint alleges Section 1983 violations of the Fifth and Fourteenth Amendments and state negligence claims against Jefferson County, Evan, and Does 1-5.  Defendants Jefferson County and Evan filed a motion for summary judgment on all claims.  At the motion hearing on Sept. 30, 2014, representatives agreed to dismiss their undeveloped claims against Does 1-5.

For the reasons stated below, representatives' section 1983 claims should be dismissed with prejudice and the state law negligence claims dismissed without prejudice.

## LEGAL STANDARD

A party moving for summary judgment must show there is "no genuine dispute as to any material fact" and that the party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Disputed facts do not preclude summary judgment unless they are material facts, facts that could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, in reviewing the motion for summary judgment, the Court construes all facts in the light most favorable to the non-

moving party.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  After doing so, if a "fair-minded jury still could not return a verdict for the plaintiff on the evidence presented," the Court must grant summary judgment.  *Anderson*, 477 U.S. at 252.

## DISCUSSION

Section 1983 enables plaintiffs to sue individuals and municipal governments who, acting under color of state law, violate constitutional rights.  42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658  (1978).  Representatives bring Section 1983 claims against Jefferson County and Evan, alleging they violated plaintiffs' rights under the Fifth and Fourteenth Amendments.  In their complaint, representatives did not specify which rights under those amendments.[3]  However, in oral arguments, representatives clarified that they allege defendants deprived plaintiffs of life and liberty interests in violation of their due process rights under the Fourteenth Amendment. Representatives conceded that the Fifth Amendment was not applicable to the case.[4]

**I. Section 1983 Claims Against Defendant Evan**

**A. Due Process and Private Actors**

In assessing the Section 1983 claims against defendant Evan, the Court must first determine

---

[3] This omission is not fatal to representatives' claims, because the law does not require them to state a constitutional basis for the Section 1983 claim, only the facts underlying it. *Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir. 1992).  Here, representatives presented facts and arguments consistent with a substantive due process argument.

[4] The Fifth Amendment's Due Process Clause only applies to the federal government, and defendants are a local government and a local law enforcement official.  *See Betts v. Brady*, 316 U.S. 455, 462 (1942), *overruled on other grounds by Gideon v. Wainwright*, 372 U.S. 335 (1963); *Castillo v. McFadden*, 399 F.3d 993, 1002 n. 5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several States.")

whether due process applies at all to his conduct.  Here, it is undisputed that Scott, the driver, initiated the high-speed chase that led to the fatal accident.  The Supreme Court has held that the Due Process Clause "was intended to prevent government from abusing [its] power, or employing it as an instrument of oppression," but nothing in the language of the clause itself  "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 755 (2005).  A police officer does not violate the Due Process Clause if his only wrongdoing is failing to prevent a private actor from killing or injuring plaintiffs.  *DeShaney*, 489 U.S. at 197;  *Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1091 (9th Cir. 2001) (due process did not apply in case where police failed to locate an injured hit-and-run driver who wandered into the desert and later died); *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (police not liable under due process for failure to implement an existing crowd control policy that would have protected plaintiffs from riotous Mardi Gras crowds); *Kalmbach v. Hill*, 2009 WL 395156 (D. Or. Feb. 2, 2009), *aff'd*, 404 F. App'x 234 (9th Cir. 2010) (state troopers did not violate due process when they failed to impound the car of a speeding and uninsured driver who later caused an accident that killed the plaintiffs).  The Due Process Clause serves to protect the people from the government, not to ensure that the government protects them from one another.  *DeShaney,* 489 U.S. at 196.

Here, representatives do not dispute that Scott, a private actor, knowingly fled a police stop with plaintiffs in the car, crossed over the center line into oncoming traffic, and struck another car,

resulting in the fatal accident. Rather, they allege that Evan failed to follow official police protocols and thereby enabled Scott to flee the stop and cause the accident. Pls.' Resp. to Mot. for Summ. J., at 14. Representatives enumerate Evan's failures to adhere to policy as follows: initiating a high-risk vehicle stop alone without backup; failing to order Scott to remove her keys from the ignition and toss them out of the car; failing to order occupants to exit the car and be restrained; failing to determine that there were small children in the backseat; and choosing to pursue the car when it fled. 2d Am. Compl., at 8. Although Evan may have failed to take certain prudent measures to prevent flight, Evan did not compel Scott to flee the traffic stop. He did not cause her to flee in violation the law,[5] to race down a dark road with her young children in the car, to drive into the oncoming lane, and to hit another car. Scott chose that risky course of action. Even Evan's pursuit of the her did not contribute to the accident, given that Scott fled for at most one minute before colliding with Kerr's car. There is no evidence that, absent pursuit, Scott would have noticed she was not being followed, slowed her car, and avoided the accident, all in one minute's time.[6] In sum, representatives

_____

[5] The undisputed facts indicate that Scott committed the crime of fleeing a police officer, a class C felony under ORS § 811.540.

[6] Notably, representatives' expert witness Gareth Jones claims that Evan's decision to pursue Scott caused the accident, but Jones attempts to support his claim by citing a study that actually undermines it. Jones cites a 1997 U.S. Department of Justice study which interviewed suspects who had been pursued by police. According to Jones, more than 70% said they would have slowed down when they felt safe. They defined feeling safe as having outdistanced their police pursuers by at least 2.3 miles on the highway. Pls.' Resp. to Mot. for Summ. J. Ex. G, at 26. In the case at bar, Scott fled for only one mile when she collided with Kerr's car. *Id.* at 16. Thus, according to Jones's cited study, even if Evan had not chased her, Scott would not have felt safe enough to slow down and would still have gotten into the fatal accident.

The Court questions Jones's qualifications as an expert in this case, but does not decide on the admissibility of his report as it would not alter the outcome of this motion for summary

fail to allege conduct by Evan that consists of abuse of government power for the purposes of oppression.  At most, Evan failed to prevent Scott's harmful conduct, and the Due Process Clause does not require public officials to prevent private harm.  *DeShaney*, 489 U.S. at 195.  Given these facts, the Due Process Clause has no bearing here, unless representatives can establish that an exception applies.

**B.  The State-Created Danger Exception**

Representatives argue that the Court should apply the state-created danger exception.[7]  The state-created danger doctrine imposes liability on government officials for harm by  private actors when two elements are met:  (1) the local government official affirmatively exposes plaintiffs to a danger they would not otherwise have faced; and (2) in doing so, the official acts with a requisite degree of culpability, generally  "deliberate indifference" to a "known and obvious danger."  *Patel v. Kent Sch. Dist.,* 648 F.3d 965, 974 (9th Cir. 2011); *Henry A. v. Willden,* 678 F.3d 991, 1002 (9th Cir. 2012); *Sussan v. Polk Cnty.*, Or., 2014 WL 657180, at *2 (D. Or. Feb. 18, 2014).[8]  However, the applicable standard of culpability is not always "deliberate indifference" and depends on the

judgment.

[7] Courts have recognized only two exceptions to the *DeShaney* rule: (1) where a special relationship existed between plaintiff and defendant; and (2) in the case of so-called state-created dangers.  *Johnson,* 474 F.3d at 639.  Here, representatives only invoke the state-created danger exception, although they misconstrue its purpose and application.  For summary judgment purposes, the Court will assume representatives properly argued the state-created danger exception.

[8] Representatives apply essentially the same criteria in their brief, but argue the second criterion is simply "deliberate indifference."  Pls.' Resp. to Mot. for Summ. J., at 12-13.

circumstances of the case. *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 854 (1998). Here, the Court does not reach the first requirement for state-created danger,[9] because representatives' claims fail on the second one. No matter which standard of culpability is applied– "deliberate indifference" or a more stringent standard– a jury could not reasonably find that Evan acted with sufficient culpability to violate due process.

### 1. Applicable Standard of Culpability

In order to violate due process, an official's conduct must be so "brutal" and "offensive" that it "shocks the conscience." *Lewis*, 523 U.S. at 846 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Because conduct that shocks the conscience in one set of circumstances may not do so in another, courts apply different standards of culpability to different scenarios of police conduct. *Lewis*, 523 U.S. at 851-53. In a situation in which "actual deliberation" is practical, an officer's "deliberate indifference" to the plaintiffs' lives and safety will violate due process. *Id.* at 853-54; *Wilkinson v. Torres*, 610 F.3d 546,

---

[9] Although the Court does not reach the criterion of whether Evan affirmatively exposed plaintiffs to a danger they would not otherwise have faced, the Court notes the state-created danger cases cited in representatives' brief present very different facts and far more egregious police conduct than the case at bar. *See* Pls.' Resp. to Mot. for Summ. J., at 12-13. In *Wood*, a state trooper arrested a drunk driver, and impounded the car. 879 F.2d at 586. Then, ignoring her protests, the trooper left the car's passenger stranded alone in a high-crime area where she was subsequently raped. *Id.* In *Penilla v. City of Huntington Park,* witnesses called 911 and reported that a man had fallen gravely ill on his porch. 115 F.3d 707, 708 (9th Cir. 1997). The police who first responded to the call cancelled paramedics, moved the collapsed man into his home, locked him in, and left him there where he later died of respiratory failure. *Id.* In *Munger v. City of Glasgow*, police officers ejected an obviously drunk man from a Montana bar, leaving him staggering in jeans and a T-shirt in below-freezing temperatures. 227 F.3d 1082, 1084 (9th Cir. 2000). They left him there after warning him not to drive. *Id.* The man died of hypothermia. *Id.*

554 (9th Cir. 2010). However, "where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554 (quoting *Lewis*, 523 U.S. at 854).

In the Ninth Circuit, the stringent "purpose to harm" standard applies categorically to police officers in high-speed police chases, even where the chase resulted in death or injury of helpless passengers or bystanders. *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008); *see Porter,* 546 F.3d at 1138-40*; see also Lewis*, 523 U.S. at 854. Courts have also applied the purpose-to-harm standard to police conduct during impromptu stops of suspects. *See, e.g., Porter,* 546 F.3d at 1138-40 (applying the standard to officers who fatally shot an unarmed driver for disobeying orders during a roadside investigation of his parked car); *see also Wilkinson*, 610 F.3d at 554 (officer on foot who shot and killed suspect fleeing in a minivan); *see also MacEachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1094-95 (C.D. Cal. 2009) (officer approached, stopped, and fatally shot a pedestrian suspect that he believed to be wielding a knife). The touchstone is whether the officer was acting under circumstances in which actual deliberation would be impractical. *Porter*, 546 F.3d at 1138; *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir.1998). Five-minute altercations between police and suspects in which circumstances escalate rapidly do not permit such deliberation. *Porter*, 546 F.3d at 1139; *Wilkinson*, 610 F.3d at 554. "When an officer encounters fast paced circumstances presenting competing public safety obligations, the purpose to harm standard must apply." *Porter*, 546 F.3d at 1149.

Here, the purpose-to-harm standard governs Evan's conduct both during the high-speed chase and in the tense, unpredictable minutes that preceded the chase.  Representatives themselves repeatedly describe defendant's stop of April Scott's car as a "high-risk vehicle stop."  2d Am. Compl., at 4-5, 6-7, 9.  Defendant Evan pulled the car over on suspicion that its occupants had just committed a burglary and that shots had been fired.  *Id.* at 6.  At the time of the stop, Evan knew the car matched the description of the suspect vehicle, occupants matched the description of the suspects, and that the suspects might well have a loaded gun.  *Id.*  The stop itself lasted at most five minutes, ending when Scott fled the scene.[10]  A high-speed pursuit then ensued.  Precedent requires that the Court apply the purpose-to-harm standard to the chase itself.  As for the traffic stop, defendant faced competing concerns for his own safety, the safety of the public, and that of the vehicle occupants. Furthermore, Scott's sudden flight forced defendant to make "split-second decisions."  *Wilkinson*, 610 F.3d at 554.  The circumstances rendered deliberation impractical if not impossible.  For this reason, the Court must also apply the purpose to harm standard to defendant's conduct during the stop.

Representatives urge that the appropriate standard of culpability is not "purpose to harm" but rather "deliberate indifference."  Pls.' Resp. to Mot. for Summ. J., at 12.  However, in doing so, they misconstrue the purpose and application of the state-created danger doctrine.  Representatives argue

---

[10]  In their second amended complaint, representatives claim the stop lasted five minutes, with defendant stopping the car at 10:08 p.m. and the car fleeing at 10:13 p.m.. 2d Am. Compl., at 6-7.  However, the state police incident report states that stop lasted three minutes, starting at 10:08 p.m. and ending when Scott fled at 10:11 p.m..  Pls.' Resp. to Mot. for Summ. J. Ex. C, at 3.

that the state-created danger doctrine is an exception to the "purpose to harm" standard":

> Generally in cases regarding high-speed chases, part one of the *Saucier* test above [a violation a constitutional right] cannot be satisfied without showing a "purpose to harm" as defendants state. However, in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), the Ninth Circuit recognized an exception in the form of the "state-created danger" doctrine. Under this doctrine, plaintiff can recover "when a state officer's conduct places a person in peril in deliberate indifference to their safety."
> Pls.' Resp. to Mot. for Summ. J., at 12.

Essentially, representatives argue that, in 1989, the Ninth Circuit created an exception to the general application of the "purpose to harm" standard in police pursuit cases. However, the courts did not adopt the "purpose to harm" standard for police pursuits until *Lewis* in 1997, eight years later. *See Lewis*, 523 U.S. at 854. As such, *Lewis*, decided after *Wood* and by the Supreme Court, is the controlling authority here. Moreover, contrary to plaintiffs' assertion, the Ninth Circuit in *Bingue* applied the *Lewis* standard broadly, and without exception, to all high-speed police chases. *Bingue*, 512 F.3d at 1177 (9th Cir. 2008) ("high-speed police chases, by their very nature, do not give the officers involved adequate time to deliberate . . . We hold, therefore, that *Lewis* requires us to apply the 'intent to harm' standard to *all* high-speed chases" (emphasis in the original)); *see Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir.1999) (*Lewis* dictates that a police officer in a high-speed chase—whether he injures the fleeing suspect or a bystander—is not liable unless he acted with a purpose to harm).

## 2. Purpose to Harm

The Court applies the purpose-to-harm standard to Evan's conduct. To establish a due process violation, plaintiffs must present facts that would support a jury finding that defendant acted

with a "purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.  Evidence of negligence, poor judgment, or even outright recklessness will not suffice to establish a violation under the purpose-to-harm standard.  The facts must show defendant acted with a purpose to harm, for example, that defendant's purpose was bullying or exacting revenge on the suspect. *Id.* at 554.

In the complaint, representatives argue that defendant not only acted negligently and recklessly, but "with the purpose of causing harm to the Plaintiffs and/or worsening their legal plight." 2d Am. Compl., at 7.  Representatives then allege defendant committed several acts during the traffic stop and high-speed chase that demonstrate his unconstitutional purpose. *Id.* at 8-9. Representatives cite defendant's failure to request backup from other officers, his decision to initiate the traffic stop alone, his failure to ask the car's driver to relinquish her keys, his failure to require the occupants exit the vehicle, and his failure to notice or accurately report the presence of young children in the car. *Id.*  Representatives also allege that defendant engaged in the high-speed chase "when no direct threat was posed to the life of defendant Evan or to the general public" and that the defendant chased the plaintiffs even though he knew that officers waiting with a spike belt a short distance away would be able to apprehend the suspects. *Id.*

Here, "the totality of the facts" simply do not support a finding that defendant intended to harm plaintiffs. *Lewis*, 523 U.S. at 850.  Representatives claim that Evan's deposition testimony and his alleged failures during the traffic stop demonstrate that he "fully expected the suspect vehicle to flee the traffic stop" and intentionally or deliberately disregarded procedures that would have

Page 14 - FINDINGS AND RECOMMENDATION

prevented the suspect's fatal flight.  Pls.' Resp. to Mot. for Summ. J., at 13-14, 11.  However, representatives provide no evidence that supports this "sweeping conclusory allegation" about defendant's state of mind and intent.  *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988) ("Sweeping conclusory allegations will not suffice to prevent summary judgment.")  Representatives base their argument on a few lines taken out of context from defendant Evan's deposition.  Evan states that, prior to stopping Scott's car, he believed the vehicle's occupants were the burglars and he expected them to "run from the get-go."  Pls.' Resp. to Mot. for Summ. J. Ex. A, at 29.  In the same deposition, Evan states that Scott then defied his expectations by pulling over and complying with initial instructions, causing him to question whether he had mistakenly stopped the wrong car.  *Id.* at 34; *see* Pls.' Resp. to Mot. for Summ. J. Ex. B, at 11-12.  Evan's statement about expecting the suspects to flee was limited to his state of mind before the stop.  According to Evan, by the time he was interacting with Scott and her passengers, he was questioning their culpability and expecting continued compliance.  Representatives misconstrue Evan's testimony in an effort to show he acted with uncanny foresight and malicious intent during the traffic stop.  Although the Court is required to resolve disputes of fact in the plaintiffs' favor, the Court need not accept representatives' conclusions, especially when the facts do not support them.  Representatives cite as further evidence of defendant's unconstitutional purpose his failures to comply with all nine detailed sequential steps in the Jefferson County Sheriff Department's procedural guidelines for high-risk vehicle stops.  Pls.' Resp. to Mot. for Summ. J., at 14; Pls.' Resp. to Mot. for Summ. J. Ex. D, at 4-5.  However, defendant's failure to observe every recommended protocol during a five-minute stop– a stop cut

short by Scott's decision to flee– does not indicate that defendant Evan intended harm to the occupants of the car.

In the same vein, Evan's decision to pursue the fleeing suspects at a high rate of speed does not evidence an intent to harm. Courts have declined to find an unconstitutional purpose to harm even in extreme cases of "precipitate recklessness." *Lewis,* 523 U.S. at 854. In *Lewis,* the Supreme Court held that officers did not act with an intent to harm when they chased a motorcyclist at 100 mph through oncoming traffic and residential streets, eventually running over and killing the motorcyclist's teenage passenger. *Id.* at 855. By contrast, in the case at bar, Evan had hardly begun to pursue Scott's car down a rural highway late at night when Scott sped into a guardrail and an oncoming car. No reasonable trier of fact could conclude that Evan chased the armed and fleeing suspects because he intended for them to strike an oncoming car or otherwise suffer injury and death. As in *Lewis*, there is "no evidence that the officer's reaction was driven by anything other than his instinct . . . to do his job as a law enforcement officer" and apprehend a fleeing suspect. *Bingue*, 512 F.3d at 1174 (quoting *Lewis*, 523 U.S. at 854). Representatives fail to present facts that could reasonably support a jury finding that Evan violated plaintiffs' substantive due process rights by acting with a purpose to harm plaintiffs.

### 3. Deliberate Indifference

Even if the Court were to apply the less demanding "deliberate indifference" standard, a jury could not reasonably find that Evan violated plaintiffs' due process rights. The deliberate indifference standard requires a showing that the official acted with deliberate indifference in

disregarding "a known or obvious consequence of his actions." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997); *Kennedy v. City of Ridgefield,* 439 F.3d 1055, 1064 (9th Cir. 2006).

Representatives provide no evidence that Evan knew of the impending danger when he failed to follow police protocols during the traffic stop. As discussed above, representatives selectively cite from Evan's testimony in an attempt to argue that Evan knew that Scott would drive off and consciously disregarded procedures that would have prevented her dangerous flight. However, no evidence shows that Evan knew Scott would flee, much less that he knew she would then collide with another car a mile away.

Not only did Evan not "know" that Scott would flee and crash her car, the fatal accident was not an "obvious" consequence of his alleged errors. Evan's failures to notice children in the car, to make the stop with backup from other officers, or to convey orders to the occupants of the car would not *obviously* result in Scott's decision to flee nor in a fatal car accident. Even if Evan had complied with all of the procedures in the high-risk stop guidelines, Scott could still have chosen to disobey his orders and drive off. As for Evan's decision to pursue Scott, the Court agrees with representatives that police should take seriously the risk of injury and death during high-speed chases. However, although fatal accidents are a possible and serious risk of police chases, they are not an "obvious" consequence. Law enforcement officers frequently pursue fleeing suspects without causing fatal accidents. Representatives fail to provide evidence that could support a finding of either purpose to harm or deliberate indifference.

As such, even if due process applied to the circumstances of this case under the state-created

danger exception, Evan did not act with sufficient culpability to violate plaintiffs' constitutional rights.  The Section 1983 claims against defendant Evan should be dismissed.[11]

## II. Section 1983 Claims Against Jefferson County

As for the claims against Jefferson County, a local government may face liability under Section 1983 only if its policies and customs resulted in the constitutional violation at issue in the case.  *Monell,* 436 U.S. at 694-95*; City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203, 103 L. Ed. 2d 412 (1989).  To impose Section 1983 liability on a local governmental entity,  plaintiffs must show (1) that they were deprived of a constitutional right;  (2) that the municipality had a policy, written or unwritten; (3) that the policy "amount[ed] to deliberate indifference" to plaintiffs' constitutional rights; and (4) that the policy was the "moving force behind

---

[11] In their brief, representatives argue that a litany of disputed facts preclude summary judgment, but representatives fail to cite any disputed facts that are material.  Representatives zero in on discrepancies in the record such as: whether or not initial reports described the burglary suspects as two women or as one woman and a passenger; differing accounts of the getaway car's initial direction of travel; conflicting descriptions of the getaway car; and differing explanations for how Evan arrived at the location where he pulled over Scott's car.  Pls.' Resp. to Mot. for Summ. J., at 2-4.  However, representatives fail to explain how any of these inconsistencies are relevant, much less how they would affect the outcome of this case.  "Mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Representatives also allege factual disputes over how quickly Evan responded to Scott's flight from the traffic stop and regarding whether or not Scott and her passengers actually committed the burglary.  Pls.' Resp. to Mot. for Summ. J., at 7-8.  However, even when these alleged disputes are viewed in the light most favorable to representatives, no reasonable jury could find defendants violated plaintiffs' due process rights.  As such, these are not genuine disputes of material fact that preclude summary judgment.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds,  Pearson v. Callahan*, 555 U.S. 223, 241 (2009).

the constitutional violation." *City of Canton*, 489 U.S. at 389; *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

The rationale for the first criterion is that there can be no Section 1983 municipal liability without an underlying constitutional violation.  Generally, if a court finds an individual officer did not violate a plaintiff's constitutional rights, the court cannot then hold the municipality liable for a failure to train or supervise that officer.  *See e.g. City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *see also Scott v. Henrich*, 39 F.3d 912, 916 (1994) ("[T]here was no violation of the decedent's constitutional rights, and thus no basis for finding the officers inadequately trained.  [Plaintiff's] claims against the municipal defendants must therefore be dismissed.")  Courts have found municipal liability in the absence of individual liability in a few narrow circumstances, such as when plaintiffs cannot identify the specific individuals who violated their rights, or when a constitutional deprivation resulted from the collective acts or omissions of a group of municipal employees.  *Hammel v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 955 F. Supp. 2d 1205, 1218 (D. Or. 2013).  However, these circumstances do not apply here.  Furthermore, representatives do not argue for any such exception.  Since the Court finds that defendant Evan did not violate plaintiffs' constitutional  rights, Jefferson County cannot be liable for causing the violation.  Representatives fail to meet the first requirement for Section 1983 municipal liability and thus, their claims against Jefferson County should be dismissed.

### III. State Law Negligence Claims

A district court may decline to exercise supplemental jurisdiction over state-law claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c). Moreover, when a district court dismisses all federal-law claims before trial, "the balance of the factors . . . point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc); *see, e.g., Crane v. Allen*, 2012 WL 602432 (D. Or. Feb. 22, 2012). Here, having dismissed all federal claims, the Court should decline to exercise supplemental jurisdiction over representatives' remaining state law claims. Accordingly, representatives' state-law negligence claims should be dismissed without prejudice. Should representatives see fit, they may refile their state-law claims in the appropriate court.[12]

### RECOMMENDATION

For the above reasons, defendants' motion for summary judgment on all of representatives' federal claims should be GRANTED, and all federal claims against defendants Jefferson County, Jason Michael Evan, and Does 1 through 5 should be DISMISSED with prejudice. The Court should decline to exercise supplementary jurisdiction over the remaining state-law negligence claims and should DISMISS them without prejudice.

---

[12] Although the statute of limitations for filing the negligence claims in state court would otherwise have expired, federal law requires state courts to toll the limitations period for the time in which representatives pursued their claims in federal court and for 30 days after dismissal. 28 U.S.C. § 1367(d); *Jinks v. Richland Cnty., S.C.*, 538 U.S. 456, 459 (2003).

**SCHEDULING ORDER**

The above Findings and Recommendations will be referred to a United States District Judge for review.  Objections, if any, are due December 5, 2014.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendations will go under advisement on that date.

IT IS SO ORDERED.

DATED this 18th day of November 2014.


 /s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

Page 21 - FINDINGS AND RECOMMENDATION